Jack W. HURLEY; International Chemical Workers Union; and International Chemical Workers Union Local 33, Plaintiffs,

v.

AGRICO CHEMICAL COMPANY, and The Williams Companies, Inc., Defendants.

No. 89–1349–CIV–T–17(A).

United States District Court, M.D. Florida, Tampa Division.

July 3, 1991.

Thomas J. Pilacek, Longwood, Fla., for plaintiffs.

Edward C. Larose, Trenam, Simmons, Kemker, Scharf, Barkin, Frey & O'Neill, P.A., Tampa, Fla., and Steven W. McGrath and R. Mark Solano, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, Okl., for defendants.

## ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

This cause is before the Court on motions for summary judgment filed by all the parties. Defendant Agrico Chemical Company (Agrico) filed its motion for summary judgment and statement of uncontested material facts on August 23, 1990. Plaintiffs Jack W. Hurley, (Hurley), International Chemical Workers Union, (ICWU), and International Chemical Workers Union Local 33, (ICWU 33), filed a cross-motion for summary judgment and statement of uncontested material facts on October 24, 1990. Defendant The Williams Companies, Inc. (TWC) filed its motion for summary judgment and statement of uncontested material facts on November 29, 1990. All of the parties have responded in opposition to the motions for summary judgment that were filed against them.

Plaintiffs filed this action on October 2, 1989 as a federal question under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for the alleged breach of a collective bargaining agreement. Plaintiffs allege Defendants breached an unidentified collective bargaining agreement to which Hurley is supposedly a third-party beneficiary. Plaintiffs seek for Hurley either reinstatement to active employment or a renewal of his terminated LTD benefits.

Fed.R.Civ.P. 56(c) provides that summary judgment is proper:

> If the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

 This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. The Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First Nat'l Bank of Mt. Pleasant*, 595 F.2d 994, 996–7 (5th Cir.1979), quoting *Gross v. Southern R.R. Co.*, 414 F.2d 292 (5th Cir.1969). Material factual disputes preclude summary judgment.

The Supreme Court of the United States in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1988) stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact", since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the non-moving party has failed to make a sufficient showing on an essential element of her case to which she has the burden of proof.

Further, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1988). This Court is satisfied that Defendants have sustained their burden of establishing that no material factual disputes remain for resolution at trial.

### UNDISPUTED FACTS

1) Plaintiff Hurley was hired by Agrico Chemical Company in 1959. Agrico was engaged in the manufacture and sale of fertilizer products and related chemicals in Polk County, Florida. Hurley was a member of Plaintiffs International Chemical Workers Union (ICWU) and International Chemical Workers Union Local 33 (ICWU 33).

2) In 1972 Defendant The Williams Companies (TWC) acquired ownership and assumed operation of Agrico Chemical Company's mines and plant.

3) On February 1, 1985 Hurley was placed on authorized medical leave by Agrico then one of The Williams Companies. Hurley had injured his back in 1966. He had a series of recurring back injuries after 1966. Hurley's back injuries rendered him unable to perform full job duties. Hurley's

doctor allowed him to perform light duty which Agrico accommodated from April 12, 1976 through February 1, 1985. During his leave Hurley applied for and ultimately received Long Term Disability (LTD) benefits through the TWC LTD plan.

4) When Hurley was placed on authorized medical leave, Agrico was a party to a collective bargaining agreement with Plaintiffs ICWU and ICWU 33. Hurley, as an employee of Agrico, was a member of the bargaining unit represented by Plaintiff Unions.

5) On September 11, 1985 Agrico and the Plaintiff Unions submitted a grievance filed on behalf of Hurley to final and binding arbitration. The grievance protested Agrico's placement of Hurley on authorized medical leave of absence.

6) On October 30, 1985 arbitrator George V. Eyraud issued an award ruling that Agrico's placement of Hurley on authorized medical leave of absence did not violate the collective bargaining agreement between Agrico and the Plaintiff unions.

7) On or about February 28, 1987, the assets of Agrico Chemical Company (Agrico) were sold by The Williams Companies (TWC) to Freeport–McMoRan Resource Partners Limited (Freeport). Hurley was on LTD at the time of the sale. Freeport initially states that it assumed ownership and commenced operation of Agrico in May, 1987. TWC and Plaintiffs contested Freeport's assertion, claiming Freeport owned and operated Agrico as of February 28, 1987. Freeport did not refute TWC and Plaintiffs' assertions in a response filed on November 30, 1990.

8) The terms of the sale agreement between TWC and Freeport were provided to Plaintiffs. On April 10, 1987 Alex McIlwain (McIlwain), Manager, Industrial Relations, for Agrico Chemical Company, sent a letter on Agrico letterhead to Jimmy Sams (Sams), International Representative, International Chemical Workers Union Local 33. The letter was McIlwain's response to requests for information regarding the effect of the sale of Agrico to Freeport. The letter explained various employment and

benefit matters of concern to the bargaining unit employees. On the issue of Long Term Disability the letter stated:

*LTD—Company to continue with the employees on LTD*

Bargaining unit employees on LTD as of the effective date of the sale of Agrico (i.e., 2–28–87) will be TWC's responsibility. Those employees will remain employees of TWC and will be eligible to continue participation at the same levels in the medical, life, dependent life and dental plans as currently provided. Employees who go on approved disability during the term of the Management Agreement will be Agrico's responsibility as included in the contractual provisions. Future benefit changes, if any, will be determined.

Plaintiffs refer to the April 10, 1987 letter as a "letter agreement" (Plaintiffs' Complaint ¶¶ 21, 22).

9) Agrico, with approval by Freeport Minerals Company, entered into a three year collective bargaining agreement with Plaintiff Unions effective May 15, 1987 (Agrico–Freeport CBA). In the Agrico–Freeport CBA it stated:

THIS AGREEMENT, effective May 15, 1987, is between **AGRICO CHEMICAL COMPANY,** a Division of Freeport Minerals, herein called "Company" or "Agrico" and the INTERNATIONAL CHEMICAL WORKERS UNION, and its LOCAL NO. 33, herein collectively called "Union".

Agrico, when it was part of The Williams Companies, had a previous collective bargaining agreement with Plaintiff Unions. (Agrico–TWC CBA). In the Agrico–TWC CBA it stated:

THIS AGREEMENT, effective May 18, 1984, is between AGRICO CHEMICAL COMPANY, one of the Williams Companies, herein called "Company" or "Agrico" and the INTERNATIONAL CHEMICAL WORKERS UNION, and its LOCAL NO. 33, herein collectively called "Union".

The Agrico–TWC CBA was a two year contract that renewed for an extra year upon its expiration. McIlwain participated in the negotiations that resulted in the above collective bargaining agreements.

10) Plaintiffs assert that Freeport assumed the Agrico–TWC CBA through its actions as an alleged "successor" employer. It makes that claim because: no employees were terminated by Freeport; the same payroll account was used to pay employees; wages were not changed; employees jobs did not change; fringe benefits did not change; grievances were processed; and all employees were given credit for full seniority accrued with Agrico–TWC. Further, Plaintiffs assert that Freeport became the employer of Hurley when it assumed the Agrico–TWC CBA. (Plaintiffs' statement of uncontested material facts 10(a)-(g)).

Freeport responds that it did not assume the Agrico–TWC CBA simply because the Agrico–TWC CBA remained in effect until Freeport negotiated its own collective bargaining agreement with Plaintiff unions in May, 1987. Freeport provides testimony from Sams as follows:

A. They [Freeport] were not committing that there were going to even be benefits to our new people. As a matter of fact, they [Freeport] did not even want the union in there and they attempted to keep it out. They did not incriminate themselves by saying that there would be any [benefits], because they were not even recognizing us as a union at that time.

Sams deposition page 27.

Freeport provides testimony from McIlwain as follows:

Q. And with regard to Freeport, they were taking the position, as you told us, that there was no union and no union contract. Is that correct?

A. They were not nonunion, they were a very anti-union company and they wished to remain that way.

Q. And so this position was being taken, as I understand you and correct me if I'm wrong, by yourself speaking on their behalf at a time after the sale?

A. They are Williams or they are Freeport?

Q. Freeport.

A. The only thing we did or I could do was sit down and talk to the committee in an unofficial capacity and say hey, guys, these guys [Freeport] don't want a union....

McIlwain deposition pages 30–31.

Moreover, Plaintiffs include in their exhibits deposition testimony from McIlwain as follows:

Q. Now, do you recall any discussions which occurred between yourself [McIlwain] and other representatives of management and union representatives during that time frame, during the transition I'll call it, where Freeport was expressing a position that there would be a 60–day plant closure?

A. I don't remember a plant closure. I know most certainly that they took the position that there was no obligation to continue employee seniority, and that employees would have to make application and be reselected for employment. This caused a minor, if I may say that facetiously, problem with the union. Basically they wanted to destroy seniority.

Q. And the union employees objected to that, I would assume?

A. Very strongly.

Q. In fact, didn't it come down to the point where management was notified that if that was going to be Freeport's position, there was going to be a strike?

A. Most definitely that was what we were told.

\* \* \* \* \* \*

Q. Now, during that same time frame, I believe you told us already that Freeport was insisting that all of the bargaining unit employees covered by the contract should or must submit new employment applications. Is that correct?

A. That was a Freeport requirement, yes.

Q. Do you know of any employees who did not submit an application?

A. To be honest with you, I don't know that we ever verified that every employee did. I couldn't tell you that.

McIlwain deposition page 32–33.

■ This Court is convinced from the above testimony that Freeport did not intend to assume the Agrico–TWC CBA. Whether Freeport is a "successor" employer, as a matter of law, will be addressed in the following discussion. Further, this Court finds that Plaintiffs and Freeport generally agree factually about what occurred during the transition. However, Plaintiffs and Freeport disagree on whether Freeport as a matter of law assumed the Agrico–TWC CBA. Therefore, on this point there is no genuine issue as to material fact precluding summary judgment.

11) Plaintiff unions negotiated the new Agrico–Freeport CBA that became effective May 15, 1987. During those negotiations, Plaintiff unions sought assurances from Freeport that employees on LTD at the time of the sale had reinstatement rights with Freeport. There was a lot of discussion but Freeport refused to grant any contractual rights. Freeport maintained it would consider those individuals (people on LTD during the sale) for employment on a case by case basis. Plaintiff unions argue reinstatement rights were granted based on the seniority clause of the new Agrico–Freeport CBA. The pertinent part of that article stated:

## ARTICLE IX SENIORITY

1.a. Seniority is defined as meaning length of continuous service with the Company (includes those periods when Agrico's Florida Operations were owned by American Agricultural Chemical Company; those periods when Agrico was either a division or subsidiary of Continental Oil Company: those periods when Agrico has been one of the Williams Companies, and the period when Agrico has been a Division of Freeport Minerals)....

1.b. Seniority shall be terminated if the employee quits, is discharged, or is out sick for thirty (30) months....

Plaintiffs' interpretation conflicts with unambiguous deposition testimony provided by Freeport. Sams, the primary union representative, testified as follows:

A. There was numerous times that myself and the committee came back to the

company [Freeport] and requested that they give consideration to the people that was on long-term disability prior to March 1, [1987], their being able to return to work, that they be allowed to return to Freeport as if they were an active employee. And the company at no time would commit themselves in writing to say that we will return all employees that are off under The Williams Company. They told us that they would take it under advisement what we've said and that they would take each one on their own merits.

Q. On a case-by-case basis?

A. That's exactly the words they told us. They would not commit anything until—we hear what you're saying, they will take it under advisement and we'll take each one on a case-by-case basis.

Q. And essentially, that's the full extent of the discussions that took place?

A. There was a lot of it and we would come right back almost daily, and that was their [Freeport] response.

Q. Was that what was concluded?

A. Yes. To my knowledge, that's exactly the way it stood.

Q. And you were the spokesperson for the union?

A. Yes, I was.

Sams deposition pages 45–46.

Similarly, McIlwain has testified as follows:

Q. What, if any, discussion do you recall that occurred with regard to that question; that is, what would happen to LTD employees who wanted to come back?

A. It would be up to Freeport–McMoRan. . . .

 * * * * * *

Q. . . . You're bargaining on behalf of Freeport. Now, what discussions occurred on behalf of Freeport, if any, with regard to that situation?

A. I can tell you what wasn't said. There was no guarantee that LTD employees would be taken back.

Q. But there was no statement that they would not be taken back?

A. Exactly. I'm sure discussions ensued both on and off the record for negotiations, but no final and binding conclusion was reached, as I recall.

Q. So the question was left unanswered?

A. That's right.

McIlwain deposition pages 56–58.

In addition, the Agrico–Freeport CBA with Plaintiff unions contained a "zipper clause". Article XIX of the Agrico–Freeport CBA stated in part that "[t]his agreement contains a complete understanding between the parties".

This Court is convinced from the above testimony that Agrico–Freeport did not provide contractual rights assuring reinstatement to individuals on LTD at the time of the sale. Plaintiffs' spokesperson provides unambiguous testimony to that effect. Moreover Article XIX of the Agrico–Freeport CBA forecloses the interpretation that Plaintiffs seek to advance. To agree with Plaintiffs' interpretation would be tantamount to finding contractual rights that Plaintiffs were unable to secure during negotiations. A cardinal rule in labor relations is that the grievance and arbitration process and/or the courts are not forums to achieve that which a party could not get during contract negotiations.

■ 12) Plaintiffs seek as a remedy that Hurley be reinstated to active employment with either TWC or Agrico, provided his physician will approve such action, and compensate him for all lost income (Plaintiffs Complaint prayer for relief). Hurley's reinstatement rights with Agrico–Freeport were addressed above. Similarly, this Court finds for the following reasons that Hurley has no reinstatement rights with TWC.

Plaintiffs base Hurley's reinstatement rights with TWC on the April 10, 1987 letter from McIlwain to Sams. Plaintiffs have referred to that letter as a "letter agreement". (Plaintiffs Complaint ¶¶ 21, 22). Sams and McIlwain have testified as follows regarding that "letter agreement":

Q. Let me get back to that. So clearly, when you're negotiating this agreement,

you realize that a sales occurred, a sale of assets. Is that correct?

A. Yes. That it had occurred or would be occurring, yes.

\* \* \* \* \* \*

Q. I guess I just want to understand, at the time you do this agreement, sign this agreement, what was your contemplation of what would happen to somebody that returns to work once TWC no longer has the Florida assets?

A. Okay. Under this Proposal?

Q. Yes. Under this that you've agreed to, yes. When we say this we mean Exhibit 1 [April 10, 1987 letter].

A. Under the effects bargaining here, there was no intent at all, no discussion on the employee returning to The Williams Company, not under this. There was no reason to discuss that. And it wasn't even discussed or thought about at that time, because they were gone, Williams was gone.

Sams deposition pages 24–27.

In addition, TWC provides testimony from McIlwain corroborating Sams' above testimony. McIlwain testified as follows:

Q. You said at first you've already read that one sentence into the record there, 'Bargaining unit employees on LTD as of the effective date of the sale of Agrico will be TWC's responsibility.' Do you see that sentence?

A. That's correct. Did you ask me a question?

Q. I'm about to. I just wanted to make sure you were at the same spot on the agreement, that's all.

A. All right.

Q. Regarding that entire provision that begins with that sentence, we've already talked to Mr. Sams about that. Would you have any reason to disagree with his [Sams] understanding that there was nothing in that agreement that was meant to imply that these employees would come back to work for TWC?

A. That's correct.

Q. Is that a fair statement?

A. That's correct.

Q. Since TWC, in fact, would no longer be an employer in Florida?

A. That's right.

McIlwain deposition pages 78–79.

Lastly, TWC correctly notes that Plaintiffs have essentially conceded that Hurley has no reinstatement rights with TWC. Plaintiffs state in their cross-motion for summary judgment that:

[Freeport] assumed the TWC contract through its actions, and thereby became the employer of Hurley in fact and in law, contrary to the legal conclusion asserted in statement number thirteen. Accordingly, while for LTD purposes Hurley remained an employee of TWC in the application of LTD benefits, Plaintiffs maintain that for purposes of reemployment rights upon removal from LTD, Hurley remained an employee of Agrico–Freeport by operation of law.

Plaintiffs' brief in support of cross-motion for summary judgment at pages 11–12 and Plaintiffs' memorandum in opposition to Defendant TWC's motion for summary judgement at page 11.

This Court is convinced, based on the above, that Hurley retains no reinstatement rights with TWC. Summary judgment is granted for TWC based on the uncontroverted facts.

13) As noted above, Agrico placed Hurley on authorized medical leave of absence effective February 1, 1985. In 1985 Plaintiffs and Agrico went to arbitration to settle whether Agrico violated the Agrico–TWC CBA by placing Hurley on authorized medical leave of absence. On October 30, 1985 an arbitrator issued a final and binding award which concluded that Agrico did not violate the Agrico–TWC CBA.

14) Hurley applied for and was awarded LTD benefits from TWC's LTD plan. Hurley's LTD benefits were effective on August 2, 1985. Hurley received $50.00 per month, the minimum monthly LTD benefit, from August 2, 1985 through March 31, 1989. Hurley received the minimum monthly LTD benefit because he was also receiving worker's compensation benefits of $987.99 per month.

15) TWC's LTD Plan, under which Hurley received benefits, provided that an employee would continue to receive LTD benefits while satisfying the following disability definitions:

1. Due to sickness or accidental bodily injury, he (A) is completely unable to perform any and every duty pertaining to his occupation with the employer ("easy definition") and (B) after the initial duration of a period of disability (two years from the date benefits begin) is completely unable to engage in any and every gainful occupation for which he is reasonably fitted by education, training or experience ("hard definition").

16) On June 10, 1987 Sheilah Mosley an employee benefits clerk for TWC wrote to Hurley. She reiterated to Hurley the definitions of disability under TWC's LTD plan. Further, Mosley informed Hurley that TWC would continue to evaluate his condition to determine his continued eligibility for LTD benefits.

17) In 1988 a Prudential Insurance Company claims examiner reviewed whether Hurley was still entitled to LTD benefits under TWC's LTD plan. Hurley was now under what the parties call the "hard definition" for LTD benefits. The "hard definition" requires that a person "(be) completely unable to engage in any and every gainful occupation for which he is reasonably fitted by education, training or experience". If Hurley did not meet the "hard definition" of disability his LTD benefits would be discontinued.

18) The Prudential claims examiner received a Physician's Statement dated August 23, 1988 from Dr. James D. Melton, Hurley's attending Physician. In that Statement, Dr. Melton stated that Hurley could "return to his old job if available". The job Dr. Melton was presumably referring to was Hurley's former light duty position at Agrico–TWC. Hurley was placed on authorized medical leave and separated from that job by Agrico–TWC on February 1, 1985.

19) The Prudential claims examiner also received an Initial Vocational Evaluation dated November 8, 1988 from Crawford Risk Management Services. That vocational evaluation identified jobs that Hurley could perform based on his occupation, training and experience.

20) In 1989 Prudential informed TWC that Hurley's LTD benefits should be discontinued. That determination was based on the reports concerning Hurley's condition and the "hard definition" in TWC's LTD plan. Hurley was notified by letter in March, 1989 that his LTD benefits were being discontinued effective March 31, 1989. That notification advised Hurley to submit additional evidence if he contested his removal from TWC's LTD plan.

21) Hurley called the TWC group benefits department once to complain about the termination of his LTD benefits. A TWC benefits clerk advised Hurley to submit a Physician's report about his physical condition. Further, Hurley was advised to write to TWC if he wished to appeal the termination of his LTD benefits. Hurley took no action to further contest the termination of his LTD benefits.

22) Plaintiffs seek that Hurley be reinstated immediately to his disability status attained prior to March 31, 1989, and [that he] be compensated for all lost income and medical expenses with interest accruing on amounts of income becoming due after March 31, 1989. (Plaintiffs' Complaint prayer for relief). Plaintiffs assert "that TWC has an obligation to maintain Hurley on LTD status subsequent to the sale: i.e., that his status became "frozen" for LTD purposes by virtue of the April 10, 1987 agreement". (Plaintiffs' memorandum in opposition to Defendant TWC's motion for summary judgment at page 2). Plaintiffs later assert that "Where, as here, a contract such as the April 10, 1987 contract does not contain a formal grievance procedure which results in binding arbitration, the Court has jurisdiction to resolve disputes arising thereunder". (Plaintiffs' memorandum in opposition to Defendant TWC's motion for summary judgment at page 10).

TWC responds that it has no obligation, contractual or otherwise, to continue LTD benefits for Hurley. TWC asserts that

Hurley is not disabled according to TWC's LTD plan and that the plan does not guarantee permanent disability benefits. TWC offers the following testimony about LTD benefits under TWC's LTD plan. James Crawford, President of ICWU 33, has testified:

> Q. Now, if a person is no longer eligible, no longer defined as disabled under that LTD plan, it's not your contention that he should continue to receive LTD benefits, is it?
>
> A. Any person if he's capable of going back to work, no, he will not receive long-term disability.

Crawford deposition pages 22–23.

Similarly, Sams, former International Representative now Vice President of ICWU, testified as follows:

> Q. Are you telling me, then, that under Paragraph 3 of deposition Exhibit 1 [April 10, 1987 letter from McIlwain to Sams], that anybody who was on LTD was to remain on LTD forever?
>
> A. Until they were able to return to work, yes.
>
> Q. What I'm saying is that if TWC received information that Mr. Hurley could return to work, couldn't they not then remove him from LTD status?
>
> A. Let me not use Mr. Hurley. Let me say that if—The intent of this language, as long as the person was unable to perform a regular job, the Williams Company would pay the person's LTD incurred benefits as outlined here. And it certainly was not the intent that if a person is totally able to perform his duties out there as a normal employee, that you continue paying LTD. That was not their intent, no.

Sams deposition page 30.

Similarly, McIlwain, former Manager of Industrial Relations for Agrico testified as follows:

> Q. And also, with regard to that same provision which is Number 3 [April 10, 1987 letter from McIlwain to Sams], was there any contemplation or did you indicate to the union at all that it was the intent of that provision that employees would stay on LTD whether they were

eligible pursuant to the provisions of the LTD plan or not?

> A. Certainly not. I mean that was not the intent of that.

McIlwain deposition page 79.

■ This Court is convinced based on the above that Hurley's LTD benefits were never guaranteed. TWC's LTD plan is clear concerning the definition of disability. Hurley had notice of the disability definitions in the TWC LTD plan. TWC terminated Hurley's LTD benefits after it was determined that Hurley no longer met the disability definition under the TWC LTD plan. That determination was based on a report from Hurley's attending Physician and an independent vocational analysis. Hurley was advised of his appeal rights regarding the termination of his LTD benefits. Hurley took no action to contest TWC's determination other than a phone call to complain. Hurley was advised to appeal to TWC in writing and to submit a Physician's report about his condition.

This Court finds no reason to accept Plaintiffs' conclusion that Hurley's LTD benefits were "frozen" by virtue of the April 10, 1987 "letter agreement". The above testimony clearly contradicts that conclusion. Therefore, on this point there is no genuine issue as to a material fact precluding summary judgment.

## CONCLUSIONS OF LAW

Plaintiffs filed this action under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 for alleged breach of an unspecified collective bargaining agreement. Section 185 states in part:

> (a) Suits for violation of contracts between an employer and a labor organization representing employees ... may be brought in any district court of the United States having jurisdiction over the parties....

■ Generally Section 301 actions are based on breaches of a collective bargaining agreement between an employer and a union. Therefore to bring suit under Section 301 there must first be a contract that has been breached.

■ Section 301 is not meant to replace the grievance and arbitration process common to most collective bargaining agreements. Generally, an employee may process a Section 301 suit short of the grievance procedure being exhausted when he or she also makes a claim against their union for breach of its duty of fair representation. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Diaz v. Schwerman Trucking Co.,* 709 F.2d 1371 (11th Cir.1983).

Plaintiffs claim that Freeport is a "successor" employer to TWC thereby assuming the Agrico–TWC CBA. Plaintiffs make that claim so that they can argue that Freeport became Hurley's employer and that Hurley has re-employment rights under the Agrico–Freeport CBA.

■ In order to support a finding that a successor employer assumed the predecessor's contract, there must be facts which show an intent to assume the pre-existing collective bargaining agreement. Merely maintaining the status quo under the pre-existing collective bargaining agreement does not rise to the level of an assumption of the substantive terms of that contract. *Bay Area Typographical Union No. 21 v. Alameda Newspapers, Inc.,* 900 F.2d 197 (9th Cir.1990); *Hospital & Institutional Workers Local 250 v. Pasatiempo,* 627 F.2d 1011 (9th Cir.1980), *cert denied,* 450 U.S. 918, 101 S.Ct. 1362, 67 L.Ed.2d 344 (1981). Plaintiffs assert that Freeport by its acts assumed the Agrico–TWC CBA as a matter of law. Plaintiffs offer the following quote from *NLRB v. Burns Int'l Sec. Servs.,* 406 U.S. 272, 291, 92 S.Ct. 1571, 1584, 32 L.Ed.2d 61 (1972) to support their argument:

> In many cases, of course, successor employers will find it advantageous not only to recognize and bargain with the union but also to observe the pre-existing contract rather than to face uncertainty and turmoil. Also, in a variety of circumstances involving a merger, stock acquisition, reorganization, or assets purchase, the Board might properly find as a matter of fact that the successor had assumed the obligations under the old

contract. *Cf. Oilfield Maintenance Co.,* 142 NLRB 1384 (1963). Such a duty does not, however, ensue as a matter of law from the mere fact that an employer is doing the same work in the same place with the same employees....

This Court concludes as a matter of law that Freeport did not assume the Agrico–TWC CBA as a successor employer as defined by the above case law. Plaintiffs have not convinced this court that Freeport's acts show an intent to assume the Agrico–TWC CBA. If anything, Freeport was hostile to the Plaintiff unions as evidenced in part by a threatened strike over Freeport's refusal to recognize seniority.

In conclusion this Court finds as a matter of law that Plaintiffs have not satisfactorily shown that Defendants breached a collective bargaining agreement to bring this suit within the scope of Section 301. Plaintiffs have not specified which collective bargaining agreement was breached or how a collective bargaining agreement was specifically breached.

■ The Agrico–TWC CBA expired on May 18, 1987. Plaintiffs arbitrated a grievance for an alleged breach of that collective bargaining agreement. An arbitrator rendered a final and binding award holding that TWC did not violate that agreement. This court refuses to review the merits of that award at this late date. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards". *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960).

■ The only other collective bargaining agreement is the Agrico–Freeport CBA. Hurley does not have re-employment rights under that collective bargaining agreement. Freeport did not assume the Agrico–TWC CBA as a successor employer. Moreover, the Agrico–Freeport CBA does not have contractual provisions

**1562**

assuring Hurley re-employment rights. Plaintiff unions tried negotiating for contractual provisions assuring reinstatement rights for individuals of LTD when Freeport acquired Agrico. Freeport never granted the reinstatement rights sought by Plaintiff unions. This court is unconvinced by Plaintiffs' arguments that reinstatement rights exist within Article IX of the Agrico–Freeport CBA.

This Court further concludes that the April 10, 1987 "letter agreement" gives Hurley no reinstatement rights. Plaintiffs have not established that the scope of Section 301 covers that letter. Further Plaintiffs have conceded that Hurley has no reinstatement rights with TWC.

Hurley is not entitled to reinstatement of his former LTD benefits provided by TWC's LTD plan. TWC properly discontinued Hurley's LTD benefits when Hurley no longer qualified for the benefits according to the LTD plan definitions. Moreover Hurley never exercised his appeal rights to contest the termination of his LTD benefits. Plaintiffs have not established how termination of Hurley's LTD breached a collective bargaining agreement.

Lastly, the Court finds that Defendants have sustained their burden of showing that no genuine issues of material fact remain in this dispute. Defendants have carried that burden by offering extensive facts and deposition testimony. Having thoroughly reviewed the record in this case, this Court grants summary judgment to both defendants. Accordingly, it is

ORDERED that Defendants' motions for summary judgment is granted and Plaintiffs' cross-motion for summary judgment is denied.

DONE and ORDERED.